Thank you. Our next case is Cleo, Inc. v. United States. Ms. Trosevin? Good morning, Your Honors. There are two fundamental issues in this case. The Commission's failure to determine the like products in accordance with statute, and the Commission's failure to take into account factors unrelated to dumping, which cause virtually all of the decline in the industry's performance. If it pleases the Court, I will discuss the like product issue, and my colleague, Mr. Eikenson, will address the remaining issues. What should be the standard of review here? The standard of review is the standard of review applied in the lower court, which is... Why do we redo what the lower court does? You review the lower court's decision de novo, applying the same standard. Why do we redo what they do? They did something. Shouldn't that be given some sort of deference? Your Honor, under the case law, the court here is to step into the shoes of the Court of International Trade and ensure that the court reached the right conclusion by applying the standard to which that court was to have applied in the first instance. You're aware this is a somewhat controversial issue, and has been for some time. Yes, Your Honor, I am aware of that. What would you advise us to do? Your Honor, I would advise you to look at this de novo under the standard of review established under Chevron in terms of... Because you want us to reverse. Because you want us to reverse. Yes, we want you to reverse. We'll ask the other party as well. That's right. The statutory construct for the injury analysis is based on market economics. There's price and volume and impact, all considered in the context of business cycle and conditions of competition. And the definition of like product is the foundation of that market-based analysis. What's the most important argument that these are different products, do you think? I think the most important argument is that when you look at the facts, there is no question that these products are absolutely distinct in the market. Why don't you say what you just said? The price is so different. It's not just the price is so different. But isn't the price probably the best indicator of difference in the marketplace? No, what's the best indicator of... I'm helping you out here. Well, all right, the price is certainly one indicator. But everything tells you that these products have absolutely no relationship in the market. Price, distribution, customer base, production, none of them is the same. And so you've reached the fundamental point that what you have is a situation in which imports of consumer tissue, no matter what the price, no matter what the volume, are not going to affect performance in the bulk tissue market. And the same, the reverse is also true. No matter how many bulk tissue imports you have, no matter what the price, it's going to have no impact on the consumer tissue market. Because the relationship of the products in the market, as you can see in the six-factor analysis, is so distinct that there is no mechanism within the market for one type of import to impact the other industry. And so that's why I'm saying that in that sort of a situation, when you look at the case law, you see that type of market-based analysis, where when you have that kind of a situation, like with auto glass or gift boxes or anything... And they're going to tell us in just a second that 43% of the market is all white tissue paper anyway. The two products that are in the market are packages... Bulk or consumer, it's all the same. But the product that is sold in the market is either a package of consumer tissue folds that is consumer-ready for a retailer to put on display versus a big carton of bulk tissue paper that you can bring in as a store supply item. It doesn't matter what the sheet size or color is in that carton. You cannot use it for... If you are a retailer looking for a consumer-ready product, you cannot buy that bulk tissue box. I don't care what's inside it. But the same is true if you are looking for bulk tissue as a supply item. You are not going to go out and buy 200, 300, or 400 packs of consumer-ready tissue, no matter what color they are. Let me see if I understand how far your argument goes in this direction. Suppose that we're talking about breakfast cereal of some sort, cornflakes for lack of a better example. Would you say that cornflakes, exactly the same flakes, but on the one hand, category A, flakes that are sold in very large containers to institutions, schools, or hospitals, or whatever, and on the other hand, flakes that are sold in grocery stores in smaller boxes or different products? It will depend on the facts. It will depend on how you see. Not just the packaging, that's one factor, but you would have to look at other factors, such as how they're distributed and who's making them and what the price differential are, and all of those things, because what you are looking for is, is there a relationship such that if you're going to look at the imports of one, can the market impact of those imports... that impact can be transmitted from one product to the other? If it can be, which is what the commission found, for example, in bicycles, high-end bikes and low-end bikes, but they said, you know, there's enough of an overlap in the middle for customers, enough common demand, that you have a transmission mechanism. You do not have that transmission here. Wasn't there some evidence, though, that consumer packages as large as 400 sheets are now being sold and purchased? There is. Less than 10% of the market is a seasonal club pack. It is a consumer tissue item that, one time a year, I don't believe they're normally 400 count, but yes, you can get 100 or 200 count packs in a seasonal thing. It's still a consumer item. It's once a year. It's a very small segment of the market, but they're still not competing. They're still not competing for the business supply items that the department stores are buying in cartons. Would you like to give some time to Mr. Eikenson? Yes, that would be just perfect. Thank you. Mr. Eikenson? May it please the court. The pivotal issue in this case, apart from light product, is how did the commission handle the special circumstances relating to Clio and Crystal? Clio and Crystal, during this period of investigation, were part of the domestic industry, but in the last full year of the commission's investigation period, they shut down production because of disruptions to critical supplies. As a consequence of the shutdown, the business and financial performance indicators showed declines naturally, declines in production, capacity, shipments, sales, profits, employment, and so on. Clio's and Crystal's indicators were then aggregated with those of other domestic producers to provide a portrait of what the industry looked like, and the commission found that the industry was experiencing injury by reason of dumped imports. The problem is Clio's and Crystal's negative performance indicators were not caused by dumped imports, and an examination of the industry without Clio's and Crystal's numbers does not reveal an industry that has been injured. Now, let's look at the most salient facts here. Prior to October 2002, Clio had been a distributor and essentially an importer of subject tissue paper. In October 2002, its business model underwent a sea change. It purchased the largest producer in the United States of tissue. That was Crystal Creative Products. For that acquisition, it paid $40 million. It also entered into a renewable substantial supply contract with the paper mill for the paper materials called Jumbo Roll, and it developed a plan to use its newly acquired production facility in Kentucky to supply approximately 80% of its customers' requirements. About three months later, something totally unexpected happened. Their material supplier shut down. The paper mill shut down. Secondly, almost on the heels of that disappointment, their rotogravure printer shut down. Clio needed these two supplies to service its customers. Obviously, it needed paper to make the finished tissue. It needed rotogravure printing to satisfy one of its most important customers. So Clio had to scramble to determine what could it do. The production season was starting for the next holiday season. It had to determine whether it could find a substitute supplier or either, and it ended up concluding that it could not for reasons which we've discussed in our briefs, much of which relate to very confidential information. So I'm not at liberty to go into too much detail regarding that, but they reached a decision that they could not continue to produce in the United States, and they made the decision of closing down production, and they had to turn to imports to satisfy the requirements of their customers. Now, the majority commissioners expressed misgivings about Clio's management's decision. They, based on staff interviews of a salesperson, of a supplier, the commission majority determined that Clio could have acquired a product from this supplier, even though Clio's management determined that there would be problems with that supplier. Secondly, Clio made the decision that it needed roto-rever printing to satisfy a very important customer, and this is in the record. It was Target. The commissioners determined that, notwithstanding evidence in the record that shows roto-rever printing is superior to flexographic printing, the commissioners said flexographic printing would have sufficed. There was available flexographic supply. This is the kind of decision that could be made by a board of directors questioning management's decision. It's a very unusual decision for the commission to make when it's tasked with the responsibility of determining whether domestic industry is being injured by imports. You know you're into your rebuttal. Yes. I will speed up. I do want to save some time for it. Okay. The majority commissioners, so they made the determination that Clio's management decision was wrong, and still they were left with the question of why would Clio, how could Clio be injured by imports? It really was injured by this disruption to its supply, even if its management decision was wrong, which we don't acquiesce in. As a matter of fact, we argue that there is not substantial evidence in the record to support the commission's determination. But even if the commission were correct, it doesn't indicate that a cause of this injury was due to increased imports. The imports came afterwards. After Clio determined that it could not produce with the existing supplies,  the commissioners tried to support their position by saying, well, Clio was an importer anyway. Crystal had imported in the past. But these are totally irrelevant. Clio was an importer before it decided to become a U.S. producer. And the fact that Crystal imported in the past really means nothing. Clio made the decision. It wanted to be a U.S. producer, and it purchased Crystal. So I really believe that the commission got it wrong. They would have been better advised to have followed the Altex case, the Altex decision, in which one producer in the United States was skewing the portrait of the industry because it was not injured. The claim was it wasn't injured by imports, but it was in bankruptcy, and its numbers adversely affected the numbers of the whole industry. So we would hope that this Court would agree with the reverse and remand. Thank you, Mr. Egerton. Mr. Rees? Good morning, Your Honors. What should be our standard of review? Your Honor, I think the proper standard would be the one that has been most recently articulated, at least as I understand it. And I'm thinking, of course, of the Nippon Steel case. And there the panel described the standard of review, substantial evidence that Your Honors consider, and the statute of limitations. You want us to redo exactly what the Court of International Trade did or not? That's Atlantic Sugar. You want us to follow Atlantic Sugar or not? I would really like it if the Court gave great weight to the informed opinion of the Court of International Trade, Judge Barzilay. And in fairness, talk about informed opinion. To what extent is your... How has that changed when you have a 3-3 commission vote? You know, I think you live by the sword, you die by the sword. I think you have to, an informed opinion of the Court of International Trade under this framework of judicial review, it's always a starting point. I think that leaves room for the commission in a case in which it thinks the judge might have gotten something wrong. It does leave that necessary room to argue. But at the same time, counsel on the other side can do the same. Please proceed with your argument at this point. Well, with that, and with this informed opinion as sort of the backdrop that brings us here, I wish to address both of these points that were made. The first about the domestic-like product, and then the second about this business about Clio. In terms of the... Forty percent price difference, isn't that pretty indicative of a difference in product? It's a good question. Price is one factor of six. And in fact, when you have a... But it's a pretty important factor in a marketplace, isn't it? What better indicates a market segment than what the consumers acknowledge as the price? Well, it's because, frankly, the like-product inquiry really isn't about analyzing whether there are market segments. And I guess that's a fundamental distinction, a methodological distinction that I would have with counsel on the other side. Ultimately, the purpose of the like-product inquiry is not to get to these ultimate questions of competition and causation, which you weigh when you get to the material injury question. We can flip through some of the others. You know, 11 of the 12 producers use exclusively one or the other, consumer or bulk. The packaging is different, which calls into play our folding boxes case. Only 3 of 20 purchasers that were surveyed thought that they were interchangeable. We're starting to look now at more factors than just price. Right, and I think that's the proper way to approach the issue. It's from the ground up. It's not starting from, oh, we seem to have different markets here. Let's apply that and let that color our judgment on the six factors. It's really a ground-up analysis, starting from, jeez, what physical uses and characteristics. The idea that you would ignore that the underlying product is identical, the tissue paper is identical. You were about to say, I think, that it's not a question of whether these products compete with one another, but how would you characterize then what it is we're looking for? It's really ultimately what you try to get right at this stage of the analysis is defining the domestic industry. I mean, in fact, at this stage, in a case like this, Okay, 11 of 12 produce one or the other. End of case, right? You lose right there. Except, Your Honor, when you consider their share of production quantity. It's not simply a matter of, well, let's add up their 11 of 12. In fact, in this case, it's a very significant portion, even if you look at the end of the period, and that number actually jumps way up if you look at 01 and 02, and all that information is in the record appendix. So in terms of the domestic, actually, I think the domestic producers, that's a factor that really weighs heavily in favor in the consideration. So I would actually, looking at the same facts, and I appreciate the difference, come to the absolute opposite conclusion. And I guess perhaps that's a lot of what's involved here with these very fact-intensive cases that don't necessarily... There's a six-factor test, right? Well, what do those six factors go to? We don't just create six-factor tests unless they cohesively fit together to sort of analyze a single issue. And so your exposition of the single issue is what the domestic industry is. That's what it is, but isn't that, you know, what is this competing against? I mean, isn't it sort of going back to Judge Bryson's characterization? Well, yes, it's a question of what you're asked ultimately is an industry being injured. And if two products don't compete with each other generally, how is the industry being injured? Well, that's just it. If they're not competing at all, if subject imports aren't competing with the domestic-like product, then you've got a serious causation question. But here, remember, we're looking at the domestic-like product, and we're saying, because we've got product that corresponds to the scope, we're looking within the domestic industry, should there be lines drawn, should there be one or more products. We're actually looking at domestic pieces of the equation. We haven't even gotten to the question, what about the domestics versus the imported product? And on that question, I would submit, I completely disagree with the suggestion that there's a lack of substitutability here. There's a whole argument, I think, that if the like-product analysis, if we don't win on that, then you have to think of this market as strictly segmented. And of course, the Commission didn't find that. And I think part of the problem is, when you hear this sort of argument, the issue tends to be, or what you'd expect to hear, is the subject imports are competing in a different segment. Like the BIC lighter case that we cite, with high-end and low-end. Maybe the industry's in the high-end and the imports are in the low-end. In fact, you've got some questions to grapple with. Here, it's bulk and consumer that Council's talking about. The domestic industry makes both, and the subject imports are of both. When you say the domestic industry makes both, though,  which is that there's a single domestic industry that produces both, as opposed to two different industries. Well, I get you're right. I'm racing ahead into my market segmentation, causation, the ultimate questions of competition here. Let me bring you back to the, this is a simple-minded example, but my cornflakes example. Assume that Kellogg makes cornflakes that are both bulk and also in small packages for retail, and the importers only import bulk. And they're sold in entirely different channels, to entirely different people. The prices are wildly different, because of the cost of packaging, which is most of retail costs for these kinds of things. Anyway, would you say that it's very likely that they would be found to be the same single product, for purpose of this kind of analysis? I guess it would depend on all of the myriad facts. But actually, this is a little bit like the pasta case, I think. But the trouble is, is that all of these facts, as you've conceded, can be looked at from both directions. We got a 3-3 vote at the Commission. They looked at them and split 3-3. So what do you advise us to do? And doesn't this really bring the standard of review into question? Well, actually, I would submit that whether it's a 3-3 or a 4-2... If we're just looking at the Commission and redoing the Commission's work, maybe we can vote 3-3 too. If we're deferring, it changes things. I think the Court is, I would submit, based on the standard of review, is supposed to be deferring. This is not a substitute. Not if you follow Atlantic Sugar. Well, I think the deference is to the Commission as fact finder, as credibility determiner, as, in fact, even weighing the factors themselves. So not simply the subsidiary findings, which are its province, but the weighing of the factors. And Judge Barsley very correctly pointed out a like-product case decided, Our function is not to re-weigh, re-calibrate the factors and how we weigh them. That's the Commission's function. Thank you. Mr. Reese, do you want to save any time for Ms. Cannon? I do, yes. I'll leave it to Ms. Cannon to address the CLEO. Okay. You can do that. Please, the Court. Thank you, Mr. Reese. A couple points. Let me just say on standard of review, I think in this particular case. Where's the causation in light of the CLEO problem? Where's the causation? The causation is that the imports were sold both in bulk and in consumer, an issue that they'd like you to ignore. They competed directly with the U.S. producers' products. There's myriad examples of lost sales. There were reverse Internet auctions that were conducted frequently where U.S. producers lost substantial amounts of business, including, it's a public record, Target ran them. And a reverse auction is no more than price, Your Honor. It has nothing to do with quality, fancy colors, or anything else. You just simply go on the Internet and you price, price, price until the lowest price is submitted, and that wins the bid. My clients and other members of the industry were subject to that frequently, and they lost business, and they lost it on both bulk and consumer tissue. Your position, I take it, the point you began with, is that the whole CLEO crystal argument is predicated on your opposing counsel winning on the separate product issue, right? Because once the products are viewed as the same, then that issue takes on, if not no weight, at least it takes on considerably less force. I take it that's your position, correct? I think that it does take less force, yes, Your Honor. I think that their argument, they've tried to make it also in the guise of even if the Commission found a single-like product, they've tried to say that that would also influence the database because they would basically like CLEO and Crystal's data to be removed. Now, there is a statutory provision that allows the Commission to do that. It's called the Related Party Provision. The Commission found that was not applicable here, and they have not challenged that here. So there was no satisfaction of the one legal provision that allows them to take that out. What they do instead want you to do is just close your eyes to the CLEO imports and basically accept the testimony, and you really have to focus on this, the bulk of their case was on the testimony of their president, Mr. Kelley, who said the reason we did this was because of our inability to get these supplies. And what did the Commission do? This is a classic he-said-she-said case. It looked at the other evidence. My clients came in, and they said Mr. Kelley told us he was going to China for low-priced imports. They looked at the SEC statement of the parent company of CLEO, which mentioned nothing about an inability to obtain supply. They looked at CLEO's actions after the case was filed. As soon as the case was filed, magically, CLEO was able to resume operations. It was able to give jumbo rolls. It was able to get whatever it needed. It resumed production in the United States. Now, if it was not able to get these jumbo rolls, how could it have done that? There's so much evidence out there. There's a lot of confidential. Unfortunately, I can't address that on the record here. And frankly, that was where I was going to start, was just to say that the information that the Commission was able to analyze and that the lower court was able to analyze in an in-camera session was heavily confidential in this case. And they looked at all of that, and we had a very free airing of a lot of confidential information that we can't discuss before this court. They analyzed that in very intense detail. They weighed the evidence, and they reached their conclusions. And that's precisely what their role is at the Commission as the finder of fact and at the trial court level. At this point, there's a heightened level of deference both to the Commission and, I would submit here, to the lower court who was doing intensive factual analysis, unlike a legal issue or something of that type that might come here. But, of course, that's not our standard of review. Your standard of review is Atlantic Sugar, which is that we do not give any deference to the lower court. Well, no, Your Honor. I would also submit, I think, in the Sur America case, that the court said that we consider the informed opinion of the court. We may not... Sure, we've tried to kind of shine our dicta here, but... But you're ultimately reviewing the Commission's decision. Exactly. I agree. All I'm saying is that I think that the Sur America principle that you should also consider what the lower court did is not something that should be brushed aside. If the lower court has, in the case like this, where there's very factual intensive arguments and they've gone through a very close examination of each of those in a confidential hearing of the type that we had here, I don't think that you should ignore that. I think that's something to be considered as well when you're looking at what the lower court did. But I do agree, ultimately, you are reviewing the Commission's decision. And here that's critical, because what did the Commission do? The Commission assessed the credibility of witnesses who spoke to them. They could look at them. They could assess their credibility. The Commission looked at the physical samples of the product, the bulk tissue and the consumer tissue, that they started off saying, oh, bulk is just all this white stuff that's used in, you know, stuffing shoes, and we brought it all in and said, no, it's colorful, it's beautiful, here it is. They went on a plant tour, some members of the Commission, including Commissioner Hillman, who voted in favor of one-leg product, finding that there was a lot of overlap in these manufacturing facilities. And on that point, Your Honor, let me just correct something. I think earlier there was a question about 11 of 12 producers making only one or the other. That's not true. I would refer you to page 26 of our brief. It wasn't 11 of 12. I'm hesitant to get into actual numbers, because I don't want to get into confidentiality here. But what I would encourage you to do is look at who was making what and how big they were. Because the critical factor here is not how many in a rough headcount there were, but where the bulk of the production was being done, and who was making both. And over the period of investigation, you will see that there was a huge overlap, and it's on page 26 in brackets in our brief, of companies that were making both bulk and consumer tissue during this period of investigation. It would be like saying, well, three or four companies did it. If one company was making 1,000 pounds and the three companies were each only making 100, you might say three or four did it, but still, most of it was being produced in a common manufacturing facility. And that was what Commissioner Hillman had the opportunity to see at one of our producers at Siemens, who does make both and uses the same equipment, the same processes, and the same employees to do it. I would also follow up, Your Honor, on your question about the cereal. Because I think, as Mr. Reese started to say, this pasta case that the commission had is quite similar to that point. And pasta, pasta sold into a variety of different types of markets as well. But the commission found all pasta to be a single life product. When you're looking at products like pasta or like tissue paper, you always get a range of different types. You get a range of colors. You get a range of prices. Price is not and never has been one of the critical determining factors because the commission has always looked at a class of products. And an industry producing that class of products consistent with the Senate report that told them don't divide up and look at little teeny tiny types of products and preclude relief to an industry that's deserving of it. Look at a class and look at an industry more broadly. And that's what they did here. Thank you. Thank you, Ms. Cannon. Mr. Eikenson, you have a couple of minutes remaining. If it please the court, first, with respect to Judge Price's question, Cleo's position is whether the court determines that there's a single life product or two life products, Cleo's position is the same. There would be injury. No injury. There would be no injury regardless. But your position is stronger if you win on the first issue. There's a stronger case with respect to consumer tissue. If you look at the consumer tissue industry and you look at the indicators of everyone in the industry absent Cleo, we have a stronger case. With respect to the total industry, assuming bulk and consumer make up a single industry, we really do have the same argument. Several of the indicators that we identified in our brief really decline for bulk tissue when the bulk tissue database is correct. So that, again, relies heavily on confidential information. Now, when you say corrected, this is the argument you made at the end of your brief with the bracketed numbers, the correction factor? Correct. OK. The reason is? I'm familiar with it. So I just wanted to make sure I was on the right page, literally. Yes. OK. Secondly, with regard to the related party provision that Ms. Cannon cited, all six commissioners disagreed with the argument about the related party provision. That didn't stop three commissioners from doing the causality assessment that we were asking them to do. One thing has nothing to do with the other. The related party provision is a special provision which, if the commissioners find it applicable, are free to exclude a company from the industry. But that really does not tie. If they find that the related party provision is not relevant, the commissioners' hands are not tied. They are able to still study causality and assess it the correct way. Ms. Cannon referred to conversation between our client and her client indicating that Clio was going to be importing from China. The conversation she's referring to is back in 2000. Next. Resumption of business. She indicated that, Ms. Cannon indicated that once the petition was filed, we resumed production in the United States and we therefore had no problems. But that's not what the record shows. There were significant problems. And Clio had to import, dump merchandise, and pay duty on it because of the shortages here. I see my red light is on. Thank you. Before counsel leaves, Judge Bryson has a point. I wanted to ask. The parties have alluded on a couple of occasions to the confidentiality problem in this case. And I recognize that representations are made to various parties in exchange for their cooperation in the course of the investigation. But unlike the Court of International Trade, of course, we don't do confidential and non-confidential opinions. So this poses a problem for us. Let me ask first if there is any possibility that the counsel, I have a feeling I know what the answer to this is and I have a feeling that the answer is going to be no. But I'll ask anyway. Is there any possibility among counsel that we can restrict in some generic form the scope of the requests for confidential treatment that are made in the briefs? Often we ask that question and people will say, well, there really isn't anything we care about. I take it from the references to deep confidential materials that there are things that people care about. Is there any way to limit the scope of what we're precluded from talking about? Because frankly, there's so much confidential information here that in any opinion we would write, we would have a minefield to walk through, frankly. And it would be very easy to trip over something or just not to be able to write an opinion that would make any sense to a reader that's not fully advised to what stands behind these general statements. I think this questions to both counsels. Yeah, I'm asking everybody. I would say, Your Honor, I would not reflexively say no. I can assure you that speaking for myself and I suspect my colleagues, we all have enormous difficulties in writing the public version and then the confidential version of our briefs. We have to constantly review what was kept confidential. Much of this has become stale. But nonetheless, we are not free to make that decision. Because these were representations made to other parties than the parties that are sitting here today, I take it. That's true, including the commission, commission staff. And it's very easy to, if one's not careful, to go over the line in areas that we do not permit it to. But if I may say, Your Honor, I would be pleased to have a conversation with the Commission Council and Appalachian Council to see whether there's some opportunity to revise the confidential record or to see whether it's possible to make part of it public. I would really defer to Commission Council, who had much more experience than I in this. Maybe if your co-counsel could, if you have anything to add to what Mr. Eikens had to say on this point, I think you're amenable to the release there. Yeah, yeah. Sure, sure. Well, Your Honor, to the extent that any of the information that is bracketed is information, for example, my client has requested their information and they requested confidential treatment, I'd be happy to review that with them to see if there's any information that, with the passage of time, they have less concern about. Obviously, I can't speak to the information that's been provided by other parties, but I'm happy to go through that exercise with my client. Do we want to submit it quickly? That would be helpful. Yeah, I mean, maybe the Commission's counsel and private parties' counsel can help make some decisions. Would you like to comment? Your Honor, we can also review with our clients their own individual data. It's the third party data that's the real. Your Honor, most of the data that I was referring to that I was very hesitant to get into before you, which is confidential data, I received under protective order that other companies submitted to the Commission in confidence in that. We are under a restriction clause, so I obviously could not waive that confidentiality. Nor, I suppose, can the Commission. Unfortunately, Your Honor, yeah, that puts us in a jam. In fact, we're statutorily bound to maintain confidentiality. But whatever could be worked out that might facilitate, especially in terms of these parties. I think that the Court welcomes your willingness to help us out here. And perhaps, and we don't want to impose an enormously burdensome process on you, but perhaps if you could meet, maybe even now, to see if there is some form of general restriction of the identification of confidential materials that would help us reduce the amount of pertinent material that we have to avoid referring to. That would be helpful. If it turns out that there isn't any global way to say, well, all material that is described in part two of the brief, or whatever. If there's no way to do it in a global way, and all you would be doing is saying, well, this particular number comes from 2001, and I guess nobody cares about that. And that number comes from 2002, and therefore that's all right. But anything after that, no. Then that probably isn't worth having you go through a lengthy exercise to do. But if you could explore the possibility and report back to us, that would be helpful. Thank you. Thank you. All rise. The Honorable Court is adjourned until tomorrow morning at 10 o'clock.